**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RYAN B. MOORE,**

Plaintiff,

v

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED,**

Defendant.

Case No. __
Hon.

Case: 2:26−cv−13725
Assigned To : Goldsmith, Mark A.
Referral Judge: Altman, Kimberly G.
Assign. Date : 9/29/2026 Description: CMP Moore v. Merrill Lynch, Pierce, Fenner & Smith Incorporated (tt)

/

Ryan B. Moore
33 Lakeview Rd.
Asheville, NC 28804
661-607-4951
ryanbmoore@hotmail.com

**Plaintiff, Pro Se**

/

## COMPLAINT AND JURY DEMAND

Plaintiff Ryan B. Moore, for his Complaint against Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, alleges as follows:

## PARTIES

1. Plaintiff Ryan B. Moore is an individual residing in Michigan. Plaintiff is an account holder and customer of Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated.
2. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a corporation that provides brokerage, investment, lending, and related financial services.

Merrill Lynch maintained Plaintiff's accounts, including Account No. 689-10F90 and the associated loan account, Account No. 689-11G71.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendant are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. Plaintiff is a citizen of the State of Michigan. Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated is a corporation organized under the laws of the State of Delaware and has its principal place of business in New York, New York. Accordingly, complete diversity exists between the parties.

5. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks recovery of approximately $58,329.24 in identifiable funds remaining in Account No. 689-10F90, together with more than $36,000 in finance charges that were actually assessed to the associated loan account during the period relevant to this action, additional finance charges continuing to accrue, and other damages and relief recoverable under the claims asserted below. The finance charges are claimed as substantive economic damages allegedly caused by the conduct described in this Complaint; they are not interest accruing on a judgment in this action.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including the seizure, administration, and subsequent release of Plaintiff's Merrill Lynch account and the conduct giving rise to the damages alleged herein.

## FACTUAL BACKGROUND

### A. The Seizure of Plaintiff's Merrill Lynch Account

7. Plaintiff maintained Account No. 689-10F90 with Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch").

8. On or about August 1, 2024, the United States Government seized funds held in Plaintiff's Merrill Lynch Account No. 689-10F90 pursuant to a federal seizure warrant.

9. The seizure warrant identified the property to be seized as "all funds on deposit" in Account No. 689-10F90, up to the amount specified in the warrant, and directed the appropriate officer to seize the property.

10. The warrant did not identify Plaintiff's separate Merrill Lynch loan account as property subject to seizure, nor did it state that the Government was assuming or extinguishing Plaintiff's obligations under that loan.

11. The seizure substantially deprived Plaintiff of the use and control of the funds held in Account No. 689-10F90.

12. The seized funds remained unavailable to Plaintiff while the Government and Merrill Lynch addressed the seizure and Merrill Lynch's asserted interest in funds associated with Plaintiff's outstanding line of credit.

13. At the time of the seizure, Plaintiff also maintained an associated Merrill Lynch loan account, Account No. 689-11G71.

14. The relationship between the seized funds in Account No. 689-10F90 and the associated loan account became the subject of an extended dispute between Merrill Lynch and the Government.

15. That dispute, and what Merrill Lynch and the Government ultimately did with respect to the relationship between the seized funds and the loan account, is material to the damages Plaintiff suffered and is described below.

**B. The Nine-Month Merrill–Government Arrangement**

16. The seizure did not result in the immediate transfer of all of the seized assets to the custody of the United States Marshals Service ("USMS").

17. The Government subsequently advised that there were significant delays by Merrill Lynch in turning over custody of assets subject to the seizure warrant.

18. The Government reported that the final asset was not turned over to USMS control until February 21, 2025—approximately six months after the seizure.

19. During this period, Merrill Lynch took the position that an outstanding line of credit associated with some of the seized funds should have a superior interest to the Government's interest in those funds.

20. The dispute concerning Merrill Lynch's asserted interest was not resolved until August 2025.

21. In correspondence concerning the matter, the Government stated that the issue was resolved in August 2025 when it was informed that Merrill Lynch had "severed the link between the seized funds and any other line of credit/loan."

22. The Government's description indicates that Merrill Lynch had previously treated the seized funds as linked to an outstanding line of credit or loan and that, during the course of the Government's dealings with Merrill Lynch, that relationship was represented to have been changed. The correspondence does not explain what Merrill Lynch actually did to effect that change.

23. Neither the seizure warrant nor the Government's subsequent correspondence provided Plaintiff with a complete explanation of what occurred between Merrill Lynch and the Government concerning the loan, the seized funds, Merrill Lynch's asserted priority interest, or the eventual decision to “sever” the relationship between them.

24. Plaintiff was not a party to those discussions and did not participate in whatever agreement, arrangement, accounting decision, or other process resulted in the Government being informed that Merrill Lynch had “severed the link” between the seized funds and the loan.

25. The consequences of that process were nevertheless borne by Plaintiff. The seized funds remained unavailable to him, while the associated Merrill Lynch loan remained outstanding and continued to generate finance charges.

26. The circumstances surrounding Merrill Lynch's asserted interest in the seized funds, the subsequent resolution of that issue, and the decision to “sever” the relationship between the seized funds and the loan are therefore directly relevant to the damages alleged in this Complaint.

### C. The “Severed” Account Representation

27. In August 2025, after the Government's dispute with Merrill Lynch concerning the loan and the seized funds was reportedly resolved, the Government was informed that Merrill Lynch had “severed the link between the seized funds and any other line of credit/loan.”

28. The representation was significant because Merrill Lynch had previously taken the position that its interest in the line of credit associated with some of the seized funds was superior to the Government's interest in those funds.

29. The Government's subsequent understanding was that Merrill Lynch had separated the seized funds from any other line of credit or loan.

30. Plaintiff reasonably understood the representation to mean that the seized funds and the associated Merrill Lynch loan were no longer linked and that the loan would not continue to operate as a claim against those funds.

31. The record, however, does not explain precisely what Merrill Lynch did when it “severed” the link, what account or accounts were affected, how the outstanding loan was

treated, or whether any portion of the seized funds was applied, transferred, reclassified, or otherwise accounted for in connection with the loan.

32. Those questions became particularly important because the associated loan was not paid off when the funds were seized and continued to accrue finance charges after the seizure.

33. Plaintiff subsequently learned that the loan remained outstanding and that finance charges continued to be added to its balance, notwithstanding the Government's representation that Merrill Lynch had severed the relationship between the seized funds and the loan.

34. Plaintiff has never been provided a complete accounting explaining how Merrill Lynch treated the seized funds and the associated loan during and after the Government's nine-month process with Merrill Lynch.

35. Plaintiff therefore alleges, upon information presently available to him, that Merrill Lynch's handling of the relationship between the seized funds and the loan caused or contributed to the continued existence of the loan balance and the finance charges incurred by Plaintiff after the seizure.

36. The documents presently available to Plaintiff establish the existence of the seizure, Merrill Lynch's asserted interest in the seized funds, the Government's subsequent statement that Merrill Lynch had “severed the link” to the loan, and the continued accrual of finance charges on the loan. The details of the transactions and communications underlying those events are within Merrill Lynch's possession and control and are expected to be further established through discovery.

**D. The September 9, 2026 Release Order**

37. On September 9, 2026, the United States District Court for the Eastern District of Michigan entered an Order Granting Government’s Motion to Release Funds Seized Pursuant to a Seizure Warrant in In re: Seizure Warrant, Misc. No. 1:24-mc-51025-1.

38. The Court's Order directed Merrill Lynch to retitle or change the ownership and access designation of Account No. 689-10F90, remove the United States Marshals Service's access and ownership, and revert the account's access and ownership to the account holders who had access to and ownership of the account before the seizure warrant.

39. The Order therefore expressly directed that the account be returned to the ownership and access status that existed before the Government's seizure.

40. The Government served the Order on Merrill Lynch.

41. On September 11, 2026, Assistant United States Attorney Philip Ross advised Merrill Lynch's counsel, Jeff White, that the Court had entered an order releasing the seized funds to Merrill Lynch's customer and provided the Order to counsel.

42. On September 15, 2026, Merrill Lynch's counsel advised Plaintiff's counsel that Merrill Lynch was still working through the process of retitling the account.

43. On September 16, 2026, Merrill Lynch's counsel advised Plaintiff's counsel that the account had been retitled.

44. Despite the account having been retitled, Plaintiff continued to encounter problems accessing and receiving the funds. The account continued to display forfeiture-related information, and Plaintiff was not receiving ordinary account communications.

45. More importantly, Merrill Lynch did not release the funds remaining in the account to Plaintiff.

46. Thus, despite the Court's September 9, 2026 Order directing restoration of the account's ownership and access, Plaintiff remained without the use and benefit of funds that belonged to him.

**E. Merrill Lynch's Failure to Release the Remaining Funds**

47. Following the September 9, 2026 Order and Merrill Lynch's September 16, 2026 representation that the account had been retitled, Plaintiff expected Merrill Lynch to restore his access to the funds in Account No. 689-10F90.

48. Instead, Plaintiff was required to make repeated efforts to obtain the release of the funds directly from Merrill Lynch.

49. On September 22, 2026, Plaintiff contacted Merrill Lynch to arrange for the release of the funds. Plaintiff requested that Merrill Lynch pay the outstanding balance of the associated loan account and release the remaining cash to him.

50. On September 23, 2026, Plaintiff spoke with a senior Merrill Lynch representative concerning the continued failure to release the funds. Plaintiff advised that he would pursue a FINRA complaint if the matter was not resolved and requested that Merrill Lynch use its authority to resolve the matter.

51. The Merrill Lynch representative asked Plaintiff for additional time to resolve the matter and represented that he would use his position within Merrill Lynch to move the matter forward. Plaintiff agreed to allow Merrill Lynch additional time.

52. On September 24, 2026, the Merrill Lynch representative contacted Plaintiff and advised him that the matter was effectively complete and that the requested resolution was being processed.

53. Plaintiff thereafter made additional efforts on September 24 and September 25, 2026 to arrange receipt of the funds. Merrill Lynch did not provide the funds to Plaintiff.

54. Plaintiff left Detroit on September 26, 2026 without receiving the funds or a completed resolution from Merrill Lynch.

55. As of September 27, 2026, Account No. 689-10F90 reflected a balance of approximately $58,329.24, while Plaintiff continued to lack the use and benefit of those funds.

56. Merrill Lynch therefore continued to retain or control funds belonging to Plaintiff notwithstanding the September 9, 2026 Order and despite Plaintiff's repeated requests that Merrill Lynch release them.

**F. The Loan Balance and Continuing Finance Charges**

57. At the time the Government seized the funds in Account No. 689-10F90, Plaintiff also had an outstanding balance on Merrill Lynch Loan Account No. 689-11G71.

58. The loan remained outstanding after the seizure of the funds in Account No. 689-10F90.

59. The loan account continued to accrue finance charges while the seized funds remained unavailable to Plaintiff.

60. Merrill Lynch's account records show that, as of September 25, 2026, the loan account had an opening balance of approximately $214,832.00, no repayments, and a finance charge of $1,384.62, resulting in an ending balance of approximately $216,216.62.

61. The same account records identify the $1,384.62 amount as both a borrowing and a finance charge paid, demonstrating that the charge was added to the outstanding loan balance rather than being offset by a repayment.

62. The account records further show that the loan balance had increased from approximately $204,248.53 at the beginning of 2026 to approximately $216,216.62, with approximately $11,968.09 in finance charges paid during that period.

63. These charges were not the result of Plaintiff obtaining additional funds from Merrill Lynch during this period. Rather, the charges were incurred on the existing outstanding loan balance while the funds associated with Account No. 689-10F90 remained unavailable to Plaintiff.

64. Plaintiff therefore incurred substantial finance charges as a direct consequence of the continued existence of the outstanding loan during the period in which the seized funds were unavailable to him.

65. The finance charges continued to increase the amount Plaintiff owed to Merrill Lynch even though Plaintiff was deprived of the use and benefit of the funds that had been seized.

66. Plaintiff seeks recovery of those finance charges as actual damages resulting from Merrill Lynch's conduct alleged herein.

**G. Merrill Representative's Statement Regarding the Loan**

67. Plaintiff also discussed the treatment of the loan account with Jennifer Mains, a Merrill Lynch representative involved in addressing Plaintiff's account issues.

68. During those discussions, Ms. Mains stated to Plaintiff: *"I always said, thought, that the loan account should have been paid off when it was seized and then you wouldn't have encountered all those interest fees."*

69. Ms. Mains's statement is consistent with the financial consequences reflected in Plaintiff's account records. The loan was not paid off when the funds were seized, remained outstanding, and continued to generate finance charges thereafter.

70. Plaintiff does not allege that Ms. Mains's statement, standing alone, establishes a legal obligation to pay off the loan. Rather, the statement is evidence of Merrill Lynch's own understanding, as communicated to Plaintiff by a Merrill Lynch representative, concerning how the loan should have been treated when the funds were seized.

71. The statement is also significant because the finance charges that Plaintiff subsequently incurred are not merely theoretical damages. They were actually charged to the loan account and increased the amount Plaintiff owed to Merrill Lynch.

72. Plaintiff alleges that Merrill Lynch's failure to properly address the loan in connection with the seizure and its subsequent handling of the seized funds caused Plaintiff to incur finance charges that would not have been incurred had the loan been handled as Ms. Mains stated it should have been handled.

**H. Merrill's Handling of Plaintiff's Funds and Resulting Damages**

73. Plaintiff was deprived of the use of the funds in Account No. 689-10F90 while Merrill Lynch and the Government addressed Merrill Lynch's asserted interest in those funds and the associated loan.

74. During that period, the loan remained outstanding and finance charges continued to increase the amount Plaintiff owed to Merrill Lynch.

75. The Government ultimately stated that Merrill Lynch had "severed the link" between the seized funds and the loan. The September 9, 2026 Order thereafter directed Merrill Lynch to restore the account's ownership and access to the account holders who had those rights before the seizure.

76. Notwithstanding that Order, Merrill Lynch did not promptly restore Plaintiff's access to the remaining funds.

77. As a result, Plaintiff has experienced two related economic consequences: he was deprived of the use and benefit of funds held in his Merrill Lynch account, while at the same time the associated loan remained outstanding and continued generating finance charges that increased his obligation to Merrill Lynch.

78. As of September 27, 2026, approximately $58,329.24 remained in Account No. 689-10F90 and was not available to Plaintiff for his use and benefit.

79. In addition, the loan account reflected an outstanding balance of approximately $216,216.62, including finance charges that had accumulated while Plaintiff's funds remained unavailable.

80. Plaintiff has incurred more than $36,000 in finance charges over the period relevant to this Complaint as a result of the loan remaining outstanding.

81. Plaintiff seeks recovery of the funds that Merrill Lynch continues to withhold or control, the finance charges and other consequential damages caused by Merrill Lynch's conduct, and such additional damages and relief as may be established through the evidence and discovery.

82. The precise amount of Plaintiff's damages will continue to be established from Merrill Lynch's account records and other documents concerning the seizure, the loan, the disposition of the seized funds, and the communications between Merrill Lynch and the Government.

## DAMAGES

83. As a direct and proximate result of Merrill Lynch's conduct alleged herein, Plaintiff has suffered substantial economic damages.

84. First, Plaintiff remains deprived of approximately $58,329.24 in funds held in Account No. 689-10F90 as of September 27, 2026, notwithstanding the September 9, 2026 Order directing restoration of Plaintiff's ownership and access to the account.

85. Second, Plaintiff incurred substantial finance charges on Merrill Lynch Loan Account No. 689-11G71 while the funds in Account No. 689-10F90 remained unavailable to him.

86. Those finance charges were actually assessed to Plaintiff's loan account and increased the amount Plaintiff owed to Merrill Lynch. The account records presently available to Plaintiff establish more than $36,000 in such finance charges during the period relevant to this action.

87. The finance charges were not incurred because Plaintiff received additional funds from Merrill Lynch during that period. They resulted from the continued existence of the outstanding loan while Plaintiff was deprived of the use and benefit of the funds associated with Account No. 689-10F90.

88. For want of the proper treatment and timely restoration of Plaintiff's funds, Plaintiff was left bearing the continuing cost of the outstanding loan while being deprived of the corresponding funds.

89. Plaintiff further seeks recovery of any additional finance charges that accrued after the amounts reflected in the account records presently available to him, through the date the loan is properly resolved and the funds are fully restored and available to Plaintiff.

90. Plaintiff also seeks such other actual, consequential, statutory, exemplary, or other damages as may be recoverable under the causes of action asserted below and as may be established through Merrill Lynch's records and discovery.

91. Plaintiff's damages presently exceed $75,000, exclusive of interest and costs, and the precise amount will be established through Merrill Lynch's account records, transaction history, and other evidence concerning the seizure, the associated loan, the handling of the seized funds, and the finance charges imposed after the seizure.

## COUNT I — BREACH OF CONTRACT

92. Plaintiff incorporates by reference Paragraphs 1 through 91 as though fully set forth herein.

93. Plaintiff and Merrill Lynch entered into contractual agreements governing Plaintiff's Merrill Lynch accounts, including Account No. 689-10F90 and associated Loan Account No. 689-11G71.

94. Those agreements established Merrill Lynch's obligations concerning Plaintiff's accounts, including its obligations to maintain, administer, and provide Plaintiff access to his accounts and funds in accordance with the agreements governing those accounts and applicable law.

95. The September 9, 2026 Order further directed Merrill Lynch to restore Account No. 689-10F90 to the ownership and access status existing before the Government's seizure.

96. Merrill Lynch breached its contractual obligations by failing to timely restore Plaintiff's access to the funds remaining in Account No. 689-10F90 after the Government's seizure was resolved and the Court ordered restoration of the account.

97. Merrill Lynch further breached its contractual obligations by continuing to treat Plaintiff's account and funds as subject to restrictions associated with the prior seizure after the Government's seizure was resolved and Plaintiff was entitled under the governing account arrangements to regain access to his funds.

98. Merrill Lynch's failure to properly restore Plaintiff's funds deprived Plaintiff of the use and benefit of approximately $58,329.24 remaining in the account as of September 27, 2026.

99. Merrill Lynch's handling of the associated loan also resulted in Plaintiff's loan remaining outstanding and accumulating substantial finance charges during the period in which Plaintiff was deprived of the use and benefit of the funds.

100. As a direct and proximate result of Merrill Lynch's breaches, Plaintiff has suffered damages including the loss of use of his funds, more than $36,000 in finance charges incurred on the associated loan, additional finance charges continuing to accrue, and other damages to be established through discovery.

101. Plaintiff is entitled to recover all damages proximately caused by Merrill Lynch's breaches, together with any other relief available under applicable law.

## COUNT II — CONVERSION

102. Plaintiff incorporates by reference Paragraphs 1 through 101 as though fully set forth herein.

103. Plaintiff had a possessory and ownership interest in the funds held in Account No. 689-10F90.

104. On September 9, 2026, the United States District Court for the Eastern District of Michigan ordered Merrill Lynch to remove the Government's access and ownership designation from Account No. 689-10F90 and to restore access and ownership to the account holders who possessed those rights before the seizure.

105. After entry of that Order, Merrill Lynch nevertheless failed to return or make available to Plaintiff the approximately $58,329.24 remaining in the account.

106. Merrill Lynch has continued to retain or exercise control over funds in which Plaintiff has an ownership and possessory interest, despite Plaintiff's repeated demands for their release and despite the Court's direction that Plaintiff's access and ownership be restored.

107. Merrill Lynch's continued withholding or control of Plaintiff's funds has deprived Plaintiff of the use and benefit of those funds.

108. The funds have independent economic value to Plaintiff. That value does not disappear merely because the funds remained recorded in an account or because Merrill Lynch ultimately restored some portion of the account's administrative status.

109. Merrill Lynch's continued possession or control of Plaintiff's specifically identifiable funds after the Court ordered their restoration and after Plaintiff demanded their release constitutes an unauthorized exercise of dominion over property belonging to Plaintiff. Plaintiff alleges that this exercise of control over identified property is distinct from any mere failure to perform a contractual promise.

110. As a direct and proximate result, Plaintiff has suffered damages including the loss of use and benefit of the funds, together with consequential damages including finance charges incurred while Plaintiff was deprived of those funds.

111. Plaintiff is entitled to recover the value of the property converted and all damages proximately resulting from Merrill Lynch's unauthorized exercise of control over Plaintiff's property, together with such other relief as permitted by law.

**COUNT III — MONEY HAD AND RECEIVED / UNJUST ENRICHMENT**

112. Plaintiff incorporates by reference Paragraphs 1 through 111 as though fully set forth herein.

113. Merrill Lynch has had possession, custody, or control of funds in which Plaintiff holds an ownership interest, including approximately $58,329.24 remaining in Account No. 689-10F90 as of September 27, 2026.

114. Those funds had real and measurable economic value to Plaintiff. Plaintiff was entitled to possess, use, withdraw, invest, or otherwise benefit from that value.

115. Instead, Plaintiff was deprived of the use and benefit of those funds while Merrill Lynch continued to maintain the associated loan balance and assess finance charges against Plaintiff.

116. Merrill Lynch thereby retained the benefit of maintaining control over Plaintiff's funds while Plaintiff bore the economic burden of the outstanding loan and the finance charges that continued to accrue.

117. The economic value of Plaintiff's property does not depend upon whether the amount at issue is large or small. Even a thing of nominal value may constitute consideration; here, however, the value at issue is not remotely nominal. Merrill Lynch's continued control of Plaintiff's funds deprived Plaintiff of tens of thousands of dollars of available property while the associated loan continued to generate actual finance charges. Plaintiff therefore alleges a concrete economic benefit retained by Merrill Lynch at Plaintiff's expense.

118. Merrill Lynch's retention of the benefit of Plaintiff's funds, while Plaintiff received no corresponding benefit from those funds and continued to bear the cost of the associated loan, would be inequitable under the circumstances alleged herein.

119. For want of the timely restoration and proper treatment of Plaintiff's funds, Merrill Lynch retained or controlled property belonging to Plaintiff while Plaintiff incurred substantial costs that would not have been incurred had the funds and associated loan been properly handled.

120. Plaintiff therefore seeks restitution and recovery of the value of the benefits Merrill Lynch received or retained at Plaintiff's expense, including the funds remaining in Account No. 689-10F90 and the consequential finance charges attributable to the conduct alleged herein.

121. Plaintiff pleads this claim in the alternative to his contractual claims to the extent permitted by law, including to the extent Merrill Lynch disputes the existence, enforceability, or scope of any express agreement governing the specific benefits and property at issue.

**COUNT IV — DECLARATORY AND INJUNCTIVE RELIEF**

122. Plaintiff incorporates by reference Paragraphs 1 through 121 as though fully set forth herein.

123. An actual and justiciable controversy exists between Plaintiff and Merrill Lynch concerning Plaintiff's ownership, possession, access to, and right to receive the funds remaining in Account No. 689-10F90.

124. On September 9, 2026, the United States District Court for the Eastern District of Michigan entered an Order directing Merrill Lynch to remove the United States Marshals Service's access and ownership designation from Account No. 689-10F90 and to restore the account's ownership and access to the account holders who possessed those rights before the seizure.

125. Merrill Lynch subsequently advised Plaintiff's counsel that the account had been retitled. Nevertheless, Merrill Lynch has not restored Plaintiff's actual access to and use of the approximately $58,329.24 remaining in the account.

126. Plaintiff continues to face uncertainty concerning Merrill Lynch's treatment of the funds, the restrictions remaining on the account, and Merrill Lynch's refusal or failure to release the funds to Plaintiff.

127. To the extent Merrill Lynch continues to withhold or restrict access to Plaintiff's specifically identifiable funds after the entry of the September 9, 2026 Order, equitable relief is necessary to effectuate the restoration of Plaintiff's ownership and access to those funds and to prevent continuing unauthorized control over the property.

128. Plaintiff therefore seeks a declaration that Plaintiff is entitled to the ownership, possession, access to, and use of the funds remaining in Account No. 689-10F90 and that Merrill Lynch has no continuing right to withhold, restrict, or exercise control over those funds based upon the prior Government seizure.

129. Plaintiff further seeks an order requiring Merrill Lynch to immediately release and make available to Plaintiff all funds remaining in Account No. 689-10F90, together with any additional amounts that Merrill Lynch is required to restore as a result of the claims asserted herein.

130. Plaintiff further seeks such other equitable relief as may be necessary to effectuate the restoration of Plaintiff's ownership, possession, and access to his funds and to prevent Merrill Lynch from continuing to exercise unauthorized control over those funds.

131. Plaintiff pleads this claim for declaratory and injunctive relief in addition to, and to the extent permitted by law in conjunction with, the damages and restitution sought under the other claims asserted herein.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ryan B. Moore respectfully requests that this Court enter judgment in his favor and against Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated, and award Plaintiff:

A. Actual damages in an amount to be established at trial, including the approximately $58,329.24 in funds remaining in Account No. 689-10F90 and any additional amounts Merrill Lynch is required to restore to Plaintiff;

B. Recovery of the finance charges and other consequential economic damages incurred as a result of Merrill Lynch's conduct alleged herein, including finance charges imposed on Loan Account No. 689-11G71 while Plaintiff's funds remained unavailable to him;

C. Restitution and recovery of the value of any property or benefits retained by Merrill Lynch at Plaintiff's expense;

D. A declaration that Plaintiff is entitled to the ownership, possession, access to, and use of the funds remaining in Account No. 689-10F90 and that Merrill Lynch has no continuing right to withhold, restrict, or exercise control over those funds based upon the prior Government seizure;

E. Injunctive and other equitable relief requiring Merrill Lynch to release and make available to Plaintiff all funds to which he is entitled and to remove any remaining restrictions arising from the prior seizure;

F. Prejudgment and post-judgment interest to the extent permitted by law;

G. Costs of this action and such attorney fees as may be recoverable under applicable law;

H. Exemplary or other damages to the extent permitted by applicable law; and

I. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: September 27, 2026

/s/ Ryan B. Moore

Ryan B. Moore
33 Lakeview Rd.
Asheville, NC 28804
661-607-4951
ryanbmoore@hotmail.com

**Plaintiff, Pro Se**

# EXHIBIT A

September 9, 2026 Order Granting Government's Motion
to Release Funds Seized Pursuant to a Seizure Warrant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: SEIZURE WARRANT MISC. NO.:: 1:24-mc-51025-1

____________________________/

**ORDER GRANTING THE GOVERNMENT'S MOTION TO RELEASE FUNDS SEIZED PURSUANT TO A SEIZURE WARRANT**

For the reasons stated in the government's motion, it is ordered that Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") retitle and change ownership and access to Account 689-10F90 (the "Account"), specifically that Merrill Lynch remove the United States Marshals Service's access to and ownership of the Account and revert access and ownership of the Account to the account holders who had access and ownership of the Account prior to the issuance of the seizure warrant. It is further ordered that the United States Attorney's Office serve this order upon Merrill Lynch.

**IT IS SO ORDERED.**

Date: 9/9/26

s/David R. Grand
HON. DAVID R. GRAND
United States Magistrate Judge

# EXHIBIT B

Government Correspondence Regarding Merrill Lynch's
Handling of Seized Funds and Associated Line of Credit

**United States Department of Justice**

United States Attorney's Office
Eastern District of Michigan

*Ryan A. Particka*
Assistant United States Attorney

211 W. Fort Street, Suite 2001
Detroit, Michigan 48226
Telephone: (313) 226-9635
E-Mail: Ryan.Particka@usdoj.gov

August 29, 2025

**VIA EMAIL**

Jihan M. Williams
Flannery Georgalis
719 Griswold Street, Ste. 280
Detroit, MI 48226

Dear Ms. Williams:

I write in response to your letter dated July 28, 2025. As you know, the government's investigation into your client Ryan Moore remains ongoing. We have reviewed and considered your requests that the United States Attorney's Office close the investigation and return property seized pursuant to court-authorized warrants. Those requests are respectfully declined.

Your letter asserts that our investigation has been unduly prolonged. For accuracy, I note that much of the elapsed time is attributable to a back-and-forth dialogue initiated by your client's prior counsel that involved: multiple voluntary productions of records in both directions (beginning with the government's production of early discovery on or about March 16, 2023, and followed by a reverse proffer to counsel shortly thereafter); regular written and telephonic correspondence; and several additional in-person meetings. The government has acted diligently and in good faith throughout the investigation, following up on information provided by prior counsel, responding to counsel's inquiries, and making itself available for regular discussions around the possibility of a pre-indictment resolution. On more than one occasion, undersigned counsel asked prior defense counsel if we were at an impasse such that the case needed to be indicted and put to a jury; in every instance, those inquiries were met with requests to delay indictment and continue negotiations.

In fairness to your position, it has taken longer than I would have liked to find a mutually agreeable date for a reverse proffer that includes your client. As I have expressed to you previously, there was recently an office-wide reorganization and for a time I believed that I would be joined by co-counsel on this matter. Much of the delay over the past several months was in deference to that possibility. A portion of the delay was also a function of general agent availability and counsels' collective summer schedules. In any event, the requested reverse proffer session is now scheduled, and we look forward to meeting with you, your investigator, and your client on Friday, September 5, 2025, beginning around 9:30AM.

With respect to your other assertions regarding the seizure of various assets, many are inaccurate or mischaracterize the record. I do not believe it is productive to address them point by point at this stage, though I would note the following: (1) The affidavits of interest filed in Oakland County were filed in accordance with applicable Michigan law; (2) There were significant delays from Merrill Lynch in turning over custody of the assets that were the subject of the seizure warrant. The final asset was not turned over to USMS control until February 21, 2025. Further, Merrill Lynch took the position that an outstanding line of credit associated with some of the seized funds should have a superior interest to the government's interest; that issue was only recently resolved in August 2025, when the government was informed that Merrill Lynch severed the link between the seized funds and any other line of credit/loan. Because of the delays in obtaining custody of the assets, nonjudicial civil forfeiture proceedings were not initiated, such that 18 U.S.C. 983(a)(3)(B) is not applicable; and (3) Because of the potential issues related to the parallel litigation of civil and criminal proceedings, including Fifth Amendment implications, one or both parties frequently requests a stay in civil forfeiture proceedings when there is a related criminal investigation or criminal case. *See* 18 U.S.C. 981(g).

Given the history of protracted negotiations with prior counsel, we believed—perhaps erroneously—that the defense remained interested in trying to resolve the open questions by way of a pre-indictment, global resolution. If you would instead prefer to approach these matters in parallel, we are open to having that conversation following our meeting next week.

Respectfully,

JEROME F. GORGON, JR.
UNITED STATES ATTORNEY

Ryan A. Particka
Assistant United States Attorney
211 West Fort Street
Detroit, MI 48226
Ryan.particka@gmail.com
Office: 313-226-9635

CC: AUSA Catherine Morris
S/A Brent Nida, FBI